No. 518-0307. We have the same attorneys involved in this case as well, so you may proceed. Just give me one moment. I'm going to get some water. Yes, we'll wait. We'll wait here just a moment here. Just give me one moment. Sure. Okay, thank you. All right, thank you, Counselor Meeks. May I please record, Counselor? This is a similar case to what we just discussed a few moments ago with some key differences. This is another case, same lawyers, same judge, that evidence of admissions was precluded under Motion to Eliminate, and then subsequently Motion for Summary Judgment was filed and granted based on the Dead Man's Act. I want to, there was another issue at the very end of the case that I want to talk about first. I'm going to interrupt you. Absolutely. After things were being decided against you, complaints were being amended. I think you were on your third amended complaint, and then you raised raise-ups a little quicker. But you could always go under raise-ups, right? The attorneys that were handling the case at the time did raise that. Well, you and me both. Yes, my client did, yes. The defendant argued exclusive control, and so did you. Do you believe that's the law in Illinois? I did not look into that issue in the brief that Your Honor had, so I'm not sure. You're not prepared to discuss that? I'm not. I apologize. I appreciate your honesty. I really do. But that's okay. I'll talk to the defendant about it. Okay. Move on then. Sorry, Your Honor. Initially, procedurally, we filed a motion to supplement our record earlier to include a written statement by the decedent in this case. As I was preparing for this argument, I noticed that it's already in the record. That means that it was in the record. Yeah, I have a lot of questions about that written statement. Do you know how that occurred? It is not clear. It's from the record. It appears that a family member brought it to the hospital while, I'm sorry, brought it to the decedent. So I don't understand why that wasn't admissible, why a foundation couldn't be laid for that. Do you know? Am I in a position that it is admissible, Your Honor? I mean, it was certainly full of admissions. I mean, it was appended as a part of a record, that typewritten statement. And that was something that this woman did voluntarily on her own, evidently, before Attorney Allman took her statement. That's correct, Your Honor. Because he asked her about it. Yes, he did. And it's attached to that transcript of that court reporter statement, Your Honor. I believe those admissions, as we discussed, and I probably shouldn't say that because the record is not going to look very good. That is totally different. Evidentiary admissions are not subject to the Dead Man's Act. That written statement contains evidentiary admissions, and it's consistent with the statement taken by the court reporter as well. This is another case that doesn't jive with the spirit of the Dead Man's Act because we have the decedent's own words about what happened in the lawsuit. Those admissions should not have been precluded under that motion in lemonade because they are not subject to the Dead Man's Act. And I got ahead of myself. The motion in lemonade barred the use of the typewritten statement taken before a court reporter by Mr. Allman based on alleged violations of 4.3 in our ethical rules. Let's make the record clear. It was the second motion in lemonade. Yes, correct. It was entitled the second motion in lemonade. That's correct, Your Honor. Now, what standard of review do you think applies to that? That's an abuse of discretion standard, Your Honor. Well, a motion in lemonade is normally an abuse of discretion. I agree. But what is the standard of review for a sanction? That would be denouement, wouldn't it? Don't ask me. I'm asking you.  I don't know. My question to you is, now, this particular procedural tool was a motion in lemonade to prevent the use of the deposition, but it asked for a sanction. Even though it was entitled a motion in lemonade, it asked the court to sanction the defendant for violation of 4.3 of the rules of professional conduct. So I'm trying to figure out whether you view this as a sanction or whether it's a request for a sanction kind of disguised as a motion in lemonade or whether it's a true motion in lemonade or whether there's a difference. It is. It was captured as a sanction, Your Honor, and that's the case law they've cited indicates that a violation of ethical rules, a sanction for that is exclusion of evidence. But it's de novo review. I mean, if we're a rule of professional conduct, would you agree it's the same as a statute? It's viewed the same as a statute under Illinois law? I would agree with that, Your Honor. And if we're construing a statute and the application of a statute, do we do it de novo? Yes, Your Honor. So what happened in this case? Did the court sanction you or did the court exclude this on some evidentiary basis? I believe they excluded it as a sanction based on violation of Rule 4.3. So you're correct. That would be a de novo review, Your Honor. What evidence is there that was produced that showed the violation? I mean, what facts were there? The facts were essentially that Mr. Bramlett was fixing an electrical issue on the decedent's property.  He asked her to turn off the power to that area, to the pole where the light was. She did not turn the power off. She admitted in her statement that she just went in the house and got busy doing something else and didn't do it. Mr. Bramlett was then electrocuted and fell and injured. And that all comes from admissions from Ms. Edwards. But didn't she actually say go in and turn the breaker off or something? Go in the fuse box? I mean, there was no switch, apparently. It was to turn the power off at the box, I believe, Your Honor. Oh, is that a both-and-close violation? I do not know if that's on the record, Your Honor. I know, I know. But it's essentially, he planned to ask the defendant to turn the power off. She forgot to do it. He got electrocuted. Well, I know one step further. They probably had the hot wire out there rather than the cold wire to complete the circuit. I don't know how it worked. I don't have an understanding of this. I know. Go ahead. You have a much better understanding of electricity than I do, Your Honor. Who does? I can tell. I can tell. But take his evidence. So that was essentially the testimony. I guess it's not technically testimony. Those were her admissions, both in the handwritten or typewritten and signed statement and in the statement taken by Mr. Allman in front of a court reporter. That was the gist of it. Essentially, the defense is arguing that Mr. Allman, the things that he did wrong were, one, he should have contacted the defendant's insurance company, State Farm, to let them know he was going to take their insurance statement. There's no obligation anywhere to inform an insurance company that you're going to take a statement from their insurance company. Did the insurance company inform you that they were taking the statement of your client? I don't know that we represented them at the time. No, I'm talking about did State Farm inform any attorney for Mr. Bramlett when they were trying to take his statement? They did not. They didn't tell him that he had the right to consult with an attorney. But it's okay for them to do that, not Mr. Allman. That is what I believe the argument by the defense is, and I believe it's completely unfair and aggressive and out of the whole playing field. The rule of professional conduct really imposes a duty on the lawyer where the unrepresented person misunderstands the lawyer's role in the matter. That's correct. Wasn't there a statement by Mr. Allman asking her whether she's okay with this? Yes, Your Honor. So in that statement she said she felt comfortable. She wasn't promised anything for her statement. She actually, through someone, reached out to Mr. Allman to take the statement. He didn't come to her to insist on the statement. She contacted his office through an intermediary to have him come out and take the statement. And she had already made this typewritten statement, and somehow it got into someone's hands that it was appended to the court reporter's statement. Correct, Your Honor. And as I mentioned before, the statements are consistent. It didn't change anything other than adding some detail. Is there anything in the record that you could find that would reveal that somehow the decedent misunderstood the role of Mr. Allman at the time she gave the statement? I couldn't find anything, Your Honor. And he asked about medications. He asked what medications she was on. She said she was on medication for pain, but that it didn't affect her memory. And I believe she even said her mind was working fine. Is there anything in the record that indicated that the loss of her husband somehow influenced her statement? Not that it influenced her statement. I believe he acknowledged it even in the kind of – it's hard to tell. It's kind of vague, the question he asked, but I think that was referring to the loss of her husband. But she stated that she understood and was not having any problem processing. Is there any indication that Mr. Allman gave her legal advice during that statement? None. And it was clear from the statement that he had not spoken to her before that and that this was done at her request with her consent. And frankly, it would have been irresponsible of Mr. Allman not to take her statement if somebody reaches out to him and says, I want to tell you what happened. And knowing that that person has been diagnosed with cancer, to preserve that evidence, it would have been a disservice to his client not to go and get that information. At that time, no complaint had been filed, right? That's correct, Your Honor. So nobody had answered, no lawyer was identified. Correct. I guess State Farm was her homeowner's insurance. Correct. And Mr. Allman didn't know about State Farm as her homeowner's insurance, but practically speaking. He just sent a lien letter. Yes. And he didn't know if they were even going to defend at that point. That is true. I mean, surely they could have filed a notice not to defend, potentially. I've seen that a few times, Judge. And realistically. I'm familiar with the case of N. Ray Himmel. Yes, Your Honor. What does that say? That requires attorneys who have observed unethical conduct by other attorneys to report that conduct to the ARDC. And if you don't report it? You are in violation of ethical rules yourself. So the complaint in this case was filed in June 2010. Correct. Right? It took five years and three months for the defendant to raise this ethical violation. Yes, I think it was in a motion in limine prior to trial. And when that motion in limine was filed five years and three months after the complaint, the statement had already been taken before the complaint, right? Correct. And disclosed in discovery. And Mr. Allman immediately reported himself to the ARDC in light of the allegation. Yes, he self-reported. So what happened to the trial date? They stayed the action pending the resolution with the ARDC. Was that ever resolved? Not that we could do that. By the ARDC? No, I believe Mr. Allman passed away before that, right before anything could come from it. So then the court decided it. That's correct. And did so sanctioning Mr. Allman by excluding that evidence. So after the motion in limine was decided and the statement was suppressed, the court didn't address the typewritten portion of it. And the defendants, I don't see where they ever address it. But then the motion for summary judgment got filed by the defendant. Correct. And now the court just granted the motion for summary judgment. Yes, citing the Dead Man's Act. Because with the exclusion of that statement, there were no admissions to put forward for Ms. Edwards. Essentially, Mr. Bramlett would not have been able to testify to any facts that she would have known about. Well, his wife could have testified or could have been proffered, but she had a financial interest in the outcome if she was still married. Correct. So everything revolves around the suppression of the statement under Rule 4.3. It does, Your Honor. I mean, we're not dealing now with the discovery deposition. We're not dealing with – in fact, the court didn't even consider any admissions that were made by the decedent.  So, I mean, essentially, that's the issue. Whether the court was correct in sanctioning Mr. Holliman for taking the statement and the circumstances that go around it. And the only way that you get there is through speculation. There's nothing in that statement or the record that indicates Mr. Holliman did anything improper under 4.3. It's just not there. And was the decedent prepared a written statement first? Correct. And then contacted or through somebody, I'm not real clear, contacted Bernie Holliman? That's correct. And then had the oral statement with the court and so forth? Yes, that's exactly what happened. And a written statement, were there admissions? Yes, both had admissions and they were consistent. In what was said. Your client was alleged in this bystander's report that was filed by the defendant as to the motion for summary judgment that the court heard on May 11, 2018. The defendants filed a bystander's report and it's alleged in the bystander's report that State Farm relies on the fact that your client gave multiple versions of the events. What do you have to say about that? There were some differences specifically. What did your client say about the circumstances of that recording? Of the recording? Yeah. Did he have trouble with that? I don't believe he addressed it. Of the court report taking the statement? No, no, no. When State Farm called him and asked him questions, the defendant is relying on the fact that he was giving different stories. What did your client say? He said that he was on pain medication and had just suffered this serious injury and so he was not thinking straight. Were there any inaudible portions of that document? Yes, there were a lot of dashes. You weren't representing him at the time? No, ma'am. So did you ever get to hear that tape? I've not heard the tape, Your Honor. Did they produce it, do you know? I do not know that, Your Honor. I've read the statement, but I did not. Well, in your client's statement, he says that State Farm's trying to mix his words around, doesn't he? Yes, he does. He says you're trying to twist my words around? He said that directly, Your Honor. All right, thank you. The counsel has an option for rebuttal. Your Honor, Mr. Daly, and may it please the Court. My name is Jed Montgomery and I represent the appellee in this matter, Kelly VanderSand, as Executive of the State of the late Dorothy Edwards. If the circuit were properly granted summary judgment in this matter, this appellee cannot point to any admissible evidence that would establish negligence or liability on the part of Dorothy Edwards or his injury sustained on March 19, 2010. Okay, I want to stop you there because you used the word admissible evidence. So we have to back up and look at what evidence there was prior to the motion for summary judgment. My first question to you is the same as I asked Mr. Daly. In the bystander's report that was filed on behalf of Kelly VanderSand, it indicates that plaintiff's counsel wanted to proceed under the doctrine of res et saloquitur. And the bystander report says a jury could infer on the part of the defendant when questioned by the court regarding defendant's argument as to exclusive control, plaintiff's counsel stated that the power was under the exclusive control of the deceased. It seems to me that the defendant argued that because the plaintiff could not prove exclusive control, the doctrine of res et saloquitur would not apply. Is that true? Am I reading that right? Your Honor, we argue there was no exclusive control in that manner. But at the same time, the arguments of Mr. Bramlin and his former counsel established that the breaker box, as he contended, was not under the exclusive control of Ms. Edwards. He could have at any time walked in and flipped off the breakers if he wanted to, Your Honor. Okay. Is it your understanding that exclusive control is the law of Illinois as it relates to res et saloquitur? Is that what you argued? I mean, your briefs are full of it. No, Your Honor. We argued that res et saloquitur would not even be applicable in the situation. My question to you is, in your briefs, do you believe that in order to prove res et saloquitur under Illinois law, that the doctrine of exclusive control applies? No, Your Honor. Good. Under this would not be. What is the doctrine of exclusive, of res et saloquitur in Illinois? Your Honor. Do you know how the jury instruction reads? Your Honor, I'm not aware of the jury instruction. The jury instruction reads control or management and says specifically that they've removed exclusive control in Illinois back in the 80s. So your brief argues solely that they couldn't prove exclusive control, and I'm just wondering why you're banking on that when that's not the law in Illinois. Your Honor, we're not banking on that. Basically, the appellant's argument was that he could not turn off power to the breaker box because, as he stated, he had muddy boots at the time. He said what? That he had muddy boots at the time, and he could not own his Edwards house because she kept a clean house. The entire argument by appellant ignores the fact that the power to the light was controlled by an extension cord to the back porch. Even under, Your Honor's Oh, it's not from the breaker. No, it was actually attached to an extension cord. Where was that attached? Excuse me, Your Honor. Where was the extension cord? Did it have a plug? There was a plug. It was a small box with the light, Your Honor. So that was if you turned the light switch off and shut the outside light. It was established that the power to the light switch could be done or was controlled exclusively by the plugging into the outlet on the porch. But that had a switch. What? That had a switch. Your Honor, I'm not aware if there was a switch or not. So you have a porch light that's on all the time. What? That was on any time it was plugged into the outlet on the back porch. No, I'm talking about apparently there was something screwed in a socket and that plugged into that, or how did the extension cord get plugged in? Your Honor, it's unclear how the extension cord got plugged in. The confusion comes about because the appellant has told multiple different versions of the story. Well, I just want to hear your version. Yes. Okay, what do we have? We have a fuse box and we've got a breaker. Then we've got a wire that goes out to the porch light apparently, but it goes through the switch, right? Or is there a switch on the porch? Can you say no? Your Honor, I'm not aware if there is a switch on the porch at that time. So if you want to shut the porch light, you've got to go in there and shut the breaker. Is that right? Or just unplug the extension cord, Your Honor. I thought you said that was hooked to the light outside? It was hooked to the light outside, Your Honor. And also the porch light? Excuse me, Your Honor, could you restate your question? The extension cord was hooked to the light outside, you're saying? Correct, Your Honor. And you plugged it in if you want the light outside to work? Correct, Your Honor. Okay, now how do you turn the porch light on? There would presumably be a switch to the porch light, Your Honor. Okay, so now we've got a switch, okay? Correct. So if you turn the switch off to the porch light, it would shut the power off to the outside light? Presumably, Your Honor. Or how do you unplug it? There's two ways to do it. Yes, Your Honor. And neither one of them meet the exclusive control or management of Ms. Edwards at the time. But the exclusive what? What? Excuse me? Neither were in exclusive control of? They're not in exclusive control or the management of Ms. Edwards at the time. But they're under her control. The word exclusive is not in the instruction. Your Honor. It doesn't have to be exclusive. No, Your Honor. And at the circumstance of this case, at the time Ms. Edwards was inside her home, she was not on the porch, and nothing prevented Mr. Bramlett at any time from, as Your Honor said, flipping the switch. That's an affirmative defense. What you're arguing now is an affirmative defense as to what he could have done. The issue is what he asked her to do. That's their pleading. Yes, it is, Your Honor. So when you get into questions of fact, like we're talking about, assuming all these facts come in, you don't have summary judgment. Your Honor, the only evidence that he ever asked Ms. Edwards to turn off the lights is contained in her statement of her oath, which was properly excluded pursuant to Illinois Supreme Court Rule 4.3, Your Honor. Well, what about him giving that same testimony? If she admits that he told her that, he can also say that. Your Honor, he can't say that, but Mr. Bramlett has also told multiple different versions of the story. Well, wait a minute. That's a credibility issue. When you talk about different versions, somehow your briefs seem to indicate that because somebody gives a different version in a statement that has a bunch of inaudibles and dot, dot, dots, that somehow that's a basis for summary judgment. Those are credibility determinations to be made by the trier of fact. My question to you is why do you keep arguing that the statement that he made to her can't be used if she admits it? Your Honor, Mr. Bramlett has told multiple different stories, and in those stories, several of the versions that he details state that he never told Mrs. Edwards to flip off the lighter, to cut power to the pole. At one point, he tells the version of the story. Now, you're saying cut power to the pole or cut power to the back porch light? Either one, Your Honor. Well, you've got two different things, right? So whether it be flipping the switch on or unplugging, flipping the breaker, whatever would cut power to the utility pole, Your Honor. Okay. So you're saying by shutting the switch, you're shutting the power to the utility pole? Your Honor, presumably if the light in the outlet of the back porch would be connected to as you're trying to say. Okay, not necessarily without water coiling. There's ways that you still have power in the pole and you've got to switch it off, right? Presumably, Your Honor, and the problem we have. Just listen. Okay. If you have the box, from the fuse box to the back porch light, goes to the switch, and then you have the black wire is the hot wire, right? The white wire is the cold wire. Correct, Your Honor. And that goes to the box. Correct. So if you've got the black wire going to the light and the white wire going to the switch, you shut the light off with the switch, right? Presumably, yes, Your Honor. Okay. But if you've got the black wire going to the light and the white wire going to the switch, you shut the switch off. They still go off, right? Presumably. But if you have the black wire going to the switch and the black wire then goes to the light, then you plug it in. No matter what you do, you've always got a hot wire to the pole, right? Presumably, under that situation, Your Honor. You always have a hot wire to the pole, no matter what switch it is. Correct, Your Honor. Now, one of the problems we had, Your Honor, with knowing exactly how the light pole was wired is, the light pole was subsequently taken down after this had been plugged in. I know. That doesn't have to do with it. The light pole's got nothing to do with it. How about the switch? Is that taken down too? No, Your Honor. It was not taken down. So it could still be the same that time, even if it happened? It could still be the same. And one of the problems we have here is, with the death of Mrs. Edwards, no individual has testified exactly to how the pole or the light, as you said, was wired. It doesn't have to do with the pole, I said. It's got to do with the switch. Yes, Your Honor. If the switch is set up so the light will still go on and off, no matter what the black wire is. Yes, Your Honor. But if the black wire's wrong, and it's solid all the way through, and the white wire breaks the circuit, then the light will still go on and off, but you've still got a hot wire up there. So you still plug it in, even with the switch shut off, right? Correct, Your Honor. Yes. So they can sell the house. It makes no difference, does it? Still got a problem. Excuse me, Your Honor. No matter if she passed away or you sell the house, it's still the same switch. Presumably I'm not aware the switch has been changed, Your Honor. Correct. Yes. Your Honor. I want to ask you about 4.3 and the second motion in limine. Yes. The motion in limine requests a sanction for violation. Mr. Schmidt, who is a well-seasoned lawyer, he participated in this litigation for five years and three months before he ever raised a violation. Do you believe that under Himmel Mr. Schmidt was in violation as well? No, Your Honor, he was not in violation. How could he not be if he's claiming that Mr. Allman violated a rule five years later after the statement's taken? He's known about it for five years, right? He's known about this violation and the first time it's ever raised is a few days before trial, right? Isn't that the scenario? It was a few days before trial in 2015, correct, Your Honor. Yes, it was raised then. Five years later? Yes, Your Honor. What happened that he just raises it before trial? Your Honor. I mean, a light went on? No, Your Honor. Attorney's obligation under Himmel is not to be taken lightly. It is not? It is not. And it is not to be taken lightly when you accuse another lawyer of a violation? Correct, Your Honor. And your second motion in limine, I'm looking at it now. I'm looking at what evidence you had that somehow the decedent misunderstood what was going on. When her statement says she's fine with it, she'd already given a typewritten statement of her own, but you claim that she must have been confused because her husband died, although there's no evidence of that confusion. Where is the confusion? Your Honor, the confusion exists because at no time during that statement or oath did Attorney Altman clarify his role in this matter. He doesn't need to do that under the rule. It says, when the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role. Where is it that you say he reasonably should know or knows that this lady misunderstood his role? She's the one who sought him out. Your Honor, the appellant has failed to, at any time, identify on behalf of Ms. Edwards who sought out Attorney Altman. Why is that relevant? Your Honor, it goes to the admission of the lawyer. Why is it relevant who sought it out as long as we know that she was the instigator? It goes to whether or not there was an atmosphere of misunderstanding underneath the affiliation. But you didn't try to determine that either. I mean, we don't have any evidence of that. Why is that significant? Like, if you would have said, okay, who was it? If you would have done some discovery and found out that maybe it was Mr. Bramlett himself who convinced her she ought to give a statement to his lawyer, then you might have some evidence. But you're floating around this concept of, well, somebody who's unidentified did this. How is that relevant unless you can show an atmosphere of misunderstanding? Your Honor, I think it is relevant to this atmosphere of misunderstanding, as Your Honor stated, simply because without knowing Attorney Altman's role in this matter, Ms. Edwards couldn't be sure of whether or not she was dealing with someone who's representing her interest. That's not what the rule says. She reached out to him. There's no, no, if you have some information that occurred otherwise, let's have it now because I don't see it in any of your papers. I see you claiming upon information and belief. I see you claiming she must have been grieving, but nothing that says, here's in the record where she was. Your Honor, no, but as Your Honor pointed, if Ms. Edwards did reach out to Attorney Altman to solicit the statement, it stands to reason that she would have considered Attorney Altman was representing her interest in this matter. Yeah, but that's a conjecture on your part. Why didn't you do some discovery and figure that out? Your Honor, it just goes to the atmosphere of misunderstanding that would have been evident during this time the statement of oath was taken. Maybe she wanted to set the record straight before she died. That's just as equitable a conclusion as the one you're drawing. She knew she was dying. She wanted to set the record straight. Your Honor, and all of this could have been alleviated by the fact if Attorney Altman had just simply stated during the statement under oath who he represented and that he represented her son-in-law and that his interest may run adverse to hers. And you think he had a duty to do that under the rule? Your Honor, he had a duty to correct any atmosphere of misunderstanding that may have been. That's what I keep asking you is show me some place where the ladies or some place that suggests there was an atmosphere of misunderstanding. Show me some document. Show me in the statement somewhere. Your Honor, I think you just have to look to the circumstances of the statement itself and how it was given, Your Honor. Well, she reached out to him. He asked her if she's comfortable. He asked her about the pain medication, if that's going to, she said it doesn't bother her. You claim that somehow he asked leading questions, which how does that apply? I don't know. She lost her husband. She acknowledged that. She wasn't confused about that. And yet you claim that she must have been grieving. I see a lot of musts. Could have been an intimidating process for lay people. Well, she wasn't intimidated. She didn't seem intimidated. But yet you claim she was intimidated in paragraph four. So I'm looking for real facts, not conjecture. Your Honor, I think the intimidation was about the fact that her caretaker at that time was her daughter, Leslie Edwards. She was the one person in that home that Dorothy Edwards relied on and trusted. And yet Gina Bramlett took her to the hospital. Correct. Not Leslie. Correct, Your Honor. Leslie Edwards was the individual that took care of Ms. Edwards at all times and was in the home as her caretaker. And before Attorney Allman would even take the statement of the oath, he demanded that Leslie Edwards not only leave the room but leave the premises. Now, that's another conclusion that you've drawn where I see no information. You allege that upon information and belief in your motion. This demand that she leave. Why didn't she stay? There's no reason she couldn't have stayed. But you allege it upon information and belief. Your Honor, the statement of the oath was refused to be taken until Ms. Edwards. How do we know that? Leslie Edwards was there. Show me where in the record I can see that. Your Honor, it's not in the record. Thank you. But Attorney Allman stated based on that that, you know, the statement was taken. Where is that in the record, what you're saying? That's what I keep asking you, and you've just admitted it's not in the record. There's nothing I'm pleading, Your Honor, that states what Your Honor is referring to, Your Honor. However, I think the reasonable inferences. Because it's not in the record. The reasonable inferences can be drawn from that, however, which based on all the circumstances surrounding the statement of the oath, it created the atmosphere of misunderstanding in violation of 4.3. I'm going to ask you one more time, and seriously, I'm not trying to badger you at all. But what are those pieces of evidence that allow you to conclude there was a misunderstanding? Your Honor, I think it's all the circumstantial evidence that we've stated. What? The fact that. That her husband died? That her husband died. The fact that she was. That there was a court reporter present? That leading questions were asked designed to file a lawsuit against Ms. Edwards only four days later, Your Honor. How do you know that? Were you in Mr. Allman's mind? No, I was not, Your Honor. I mean, seriously, he never had the opportunity to respond. You don't know. But plaintiff has argued that it would have been silly for them not to take the statement if she reaches out and she doesn't have a lawyer yet. And maybe she wanted to set the record straight before she died. And, Your Honor, if she did wish to set the record straight, as Your Honor is imploring, at the very least turn it over to her to at least identify his claim to her and tell her that he represents a party who is adverse to her regarding the occurrence, Your Honor. I agree that he should have done that if he had any inkling that she somehow misunderstood the lawyer's role in the process. But how do you think she even knew to reach out to him? She just looked in the yellow pages? I mean, she had to have known. Your Honor, we're not aware of how or why Ms. Edwards reached out to her attorney, Allman, because she didn't pass away a month after the statement under it was taken, Your Honor. And you guys answered the – this was an interesting little tidbit where you answered the complaint on her behalf and you didn't know she had passed, right? Correct, Your Honor, at that time, yes. I see that my time is up, Your Honor. Thank you. All right. Thank you, counsel. Mr. O'Donnell? If there are no questions, I'll just take a comment from earlier argument. No questions. Okay. Thank you for your arguments. The court will take this matter under advisement and render a decision in due course.